# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 5, 2014 Session

## STATE OF TENNESSEE v. CHARLES HAMPTON and DEANTHONY PERRY

**Appeal from the Criminal Court for Shelby County**
No. 10-04814     Lee V. Coffee, Judge

No. W2012-02191-CCA-R3-CD  - Filed June 27, 2014

The defendants, Charles Hampton and Deanthony Perry, were convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment. In this consolidated appeal, Defendant Perry argues that the trial court committed plain error by failing to instruct the jury that Ladarrius Borrum was an accomplice as a matter of law and that the evidence presented at trial is insufficient to sustain his conviction for first degree murder. Defendant Hampton argues that the trial court erred in denying his right to compulsory process and excluding relevant evidence, as well as challenges the sufficiency of the evidence convicting him of first degree murder. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Paul Springer, Memphis, Tennessee, for the appellant, Charles Hampton; Juni Ganguli (at trial) and James E. Thomas (on appeal), Memphis, Tennessee, for the appellant, Deanthony Perry.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Colin A. Campbell and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case is the result of a gang dispute wherein members of the Grape Street Crips fired numerous shots at, and thus killed, the victim, Anthony Jones, a member of the same gang. The defendants and Kejuan Shields were indicted for first degree premeditated murder, and the defendants' cases proceeded to trial.

At trial, Anthony Jordan, the victim's older brother, testified that he was at his mother's house on Cameron Street on October 17, 2009, along with his mother, cousin, the victim, and a friend, David Irvin. Around 9:00 p.m., the victim received a series of phone calls, and Jordan heard the victim giving the caller, a female, directions to the house. Jordan knew the victim sold marijuana and that the caller wanted "some weed." The victim received another phone call telling him "they was outside" and walked out the front door to meet them. Within two to three minutes of the victim stepping outside, Jordan heard "a lot of gunshots . . . [i]t was over ten or fifteen." Jordan ran to the door and looked out. He saw "a young man jumping in the backseat on the driver's side" of a car parked in front of their next-door neighbor's house on the left. The man was short, had short hair, and was wearing dark-colored clothes. Jordan could not identify the man because it was dark. He saw "maybe . . . three or four" people in the car. After the young man got into the car, it sped off.

David Irvin testified that he was visiting at the victim's mother's home on Cameron Street on October 17, 2009. Around 9:00 p.m., the victim received several phone calls from a female caller asking for directions to the house, and Irvin saw the victim walk outside. Shortly after the victim went outside, Irvin heard "[t]en plus" gunshots and ran outside to look. He saw a black Nissan Maxima in front of the house next door; two men were getting into the car and a third man was "running and shooting at the ground." Irvin saw one man get in the front passenger seat, one get in the right rear passenger seat, and one get in the left rear passenger seat. Irvin could not identify any of the men, but he could tell they were all short and wearing dark clothes.

On cross-examination, Irvin acknowledged that it was not in his statement given to the police the night of the incident that, when he got outside, he saw three men run and jump in a car and one man was still shooting.

Kejuan Shields, a co-defendant of Perry and Hampton, testified that he and the defendants were members of the Grape Street Crips gang. John Foulks, Ladarrius Borrum, and the victim were also members of the gang. In October 2009, the victim cracked the rims on a car belonging to a high-ranking member of the gang, the "OG" or "Original Gangster," and failed to pay for them. The OG put out an "SOS," standing for "shoot on sight or serve on sight," on the victim, meaning the victim could be beaten or shot by other members of the gang. At that time, "word on the street" was that Defendant Hampton was also angry with the victim because the victim pulled a gun on him and shot out a window at his house.

On the day of the incident, Shields was at Borrum's house with Foulks and the defendants when a conversation arose concerning the need to "take care of [the victim] and break him off." Shields, Foulks, and the defendants left in Shields' black Ford Contour "[t]o go find [the victim]." Defendant Perry was in the front passenger seat, Defendant Hampton was in the right rear passenger seat, and Foulks was in the left rear passenger seat. The defendants both had nine-millimeter guns, and Foulks had a .32 caliber gun. They were all wearing dark clothes. Defendant Hampton called the victim and arranged to "get[] some weed," although the actual plan was to shoot the victim. Defendant Hampton called the victim eight to ten times to get directions to the house.

Shields testified that along the way to the victim's house, the group in his car met another group of gang members in Ladarrius Borrum's car. The second group was acting as a "COP" or "Crip on patrol," whose function was "to watch out for the police or go back and make sure everything was taken care of." The group in Borrum's car followed Shields the rest of the way to the victim's house and was "around the corner somewhere" during the shooting. Shields did not realize that the "Crip on patrol" had been called "until [he] ran into them." Shields said that Borrum knew they were going to execute the "SOS" on the victim.

Shields testified that, when they arrived on Cameron Street, the victim walked toward the passenger side of Shields' car and Defendant Hampton told Defendant Perry to shoot him. Defendant Perry stepped halfway out of the car and started shooting. Defendant Hampton also "stepped out of the car and started shooting." Shields could not see Foulks "during the incident." However, Shields later stated that he saw all three men shooting at the victim. Shields heard about twenty shots fired. When everyone got back into the car, Shields drove "back home to Whitehaven." Shields admitted that he was hoping to receive a deal in return for his testimony. On cross-examination, Shields acknowledged various inconsistencies between his testimony at trial and statement to police.

Officer Rodney Coleman, a patrol officer with the Memphis Police Department, testified that he responded to the call about a shooting on Cameron Street. When he arrived, less than a couple of minutes after receiving the call, he found the victim lying on the curb surrounded by family members. Officer Coleman also saw "shell casings from the sidewalk onto the street." He and other officers controlled the crowd of bystanders and protected the crime scene until investigators arrived.

Officer Thomas Ellis, who worked as a crime scene investigator with the Memphis Police Department at the time of the incident, testified that he took photographs and measurements of the scene and collected evidence. He also prepared a diagram of the scene, noting where each piece of evidence was found. He collected seventeen spent shell casings, which he turned over to property and evidence officers. Later, James Johnston, a former

officer with the Memphis Police Department, delivered the seventeen shell casings to the Tennessee Bureau of Investigation ("TBI") for analysis.

Special Agent Cervinia Braswell, a forensic scientist assigned to the TBI Firearms Identification Unit, testified that she examined the seventeen shell casings collected from the scene. She determined that six of the shells were Remington nine-millimeter cartridge casings that had been fired from the same unknown nine-millimeter firearm. Four of the shells were Federal nine-millimeter cartridge casings that had been fired from another unknown nine-millimeter firearm. The final seven shells were Winchester twenty-two long/long rifle cartridge casings that had been fired from the same unknown firearm.

Sergeant Darren Goods, a homicide investigator with the Memphis Police Department, testified that he was the case coordinator in this case. Defendant Hampton was developed as a suspect and brought in for questioning. Sergeant Goods and Sergeant Lundy spoke with Defendant Hampton, who was a juvenile at the time, in the presence of his father. After being advised of and waiving his rights, Defendant Hampton gave two statements to the police. In his first statement, Defendant Hampton told the officers that he was not involved in the murder of the victim. He admitted that he was a member of the Grape Street Crips gang and had heard a "rumor" that Kejuan Shields was the person responsible for the murder. Defendant Hampton identified Shields from a photographic array. After Defendant Hampton signed the statement, his father asked to speak with the officers privately. Defendant Hampton's father then spoke with Hampton, who decided to make another statement to the officers.

Sergeant Goods testified that, in his second statement, Defendant Hampton admitted being present when the victim was killed, although he still denied being involved. Defendant Hampton told them that Shields shot the victim, using "a little twenty-two Ruger," and was the only one in the car who had a gun. He said that a man named "Booma" was in the car with them. Defendant Hampton stated that Shields used Hampton's cell phone to call the victim and set up a pre-textual drug buy. When they arrived at the victim's house, Shields "jumped out of his car and started shooting [the victim]." He said that he broke his cell phone and threw it out the window on the drive back to their neighborhood. He claimed that he did not know that Shields planned to kill the victim. Defendant Hampton identified Ladarrius "D-Loc" Sellers from a photographic array but said that he played no part in the incident.

Sergeant Goods testified that, the next day, he interviewed Defendant Perry, who was also a juvenile at the time, in the presence of Perry's mother. Initially, Defendant Perry told the officers in an oral statement that "he was not there; he had no idea what happened" and provided his mother as an alibi witness. The officers informed Defendant Perry's mother that

they had evidence placing Perry at the scene, and Perry's mother spoke with Perry privately informing him that he needed to tell the truth. Thereafter, Defendant Perry told the officers that Kejuan Shields was responsible for the murder. Defendant Perry said that he was at Defendant Hampton's house with some others when a discussion arose that they needed "to deal with [the victim] . . . because he playin' with us too much." He got into Shields' car along with Shields, Defendant Hampton, and Jonathan Foulks, and someone called the victim to set up a drug buy and get directions to his house. Defendant Perry stated that, when they got to the victim's house, Shields "jump[ed] out the car and start[ed] shooting" the victim with a "twenty-two long pistol." The gun belonged to Perry, but Shields had "got[ten] it out of the woods" from Defendant Hampton's house where Perry kept it. Defendant Perry said that he was a member of the Grape Street Crips gang and that a car of fellow gang members was "trailing [them] the whole time." He identified the various individuals involved in separate photographic arrays.

Sergeant Goods testified that he interviewed and arrested Kejuan Shields, who told him that Defendants Hampton and Perry and Jonathan Foulks shot the victim. Shields told Sergeant Goods that he was the driver and did not have a weapon. Sergeant Goods said that Foulks was arrested but not charged in connection with the murder.

Ladarrius Borrum testified that, on October 17, he was at Defendant Hampton's house with Defendants Hampton and Perry, Foulks, Shields, "D-Loc" and "Green-Loc" when a discussion arose concerning the victim. The victim had pulled out a gun "on the street the night before," and the discussion concerned that "something needed to be done." All of the men were members of the Grape Street Crips gang, and they thought that the victim was "[t]rying to branch off and start his own stuff." The defendants, Foulks, and Shields left in Shields' car, and the others left in Borrum's car. They drove to South Memphis looking for the victim. Borrum thought they were "just going to beat [the victim] up and stuff like that." He did not know that an "SOS" had been put out on the victim.

Borrum testified that he did not follow Shields' car while they were driving around, and he was not acting as a "Crip on patrol." However, he was a few streets away from Cameron Street when he heard gunshots. Borrum knew that the defendants both usually carried a nine-millimeter weapon and Shields usually carried a twenty-two caliber weapon. Borrum stated that he was picked up by the police and thought that he would be charged with the victim's murder if he did not cooperate with them.

Dr. Miguel Laboy, an assistant medical examiner at the West Tennessee Forensic Center, testified that he performed an autopsy on the victim. Dr. Laboy documented eight gunshot wounds on the victim – wounds to the victim's head, left arm, abdomen, right thigh, left thigh, left foot, and face. Dr. Laboy recovered a bullet fragment from the head wound

but was unable to determine the caliber as it was only a fragment. Dr. Laboy concluded that the wounds to the victim's head and abdomen were lethal and that blood loss from his other wounds contributed to his death. He determined that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

Neither defendant testified nor presented any proof.

Following the conclusion of the proof, the jury convicted both defendants of first degree premeditated murder, and they were sentenced to life imprisonment. This appeal followed.

## ANALYSIS

### I. Defendant Perry's Jury Instruction Issue

Acknowledging that he did not raise the issue at trial or in his motion for new trial, Defendant Perry argues that the trial court committed plain error by failing to instruct the jury that Ladarrius Borrum was an accomplice as a matter of law.

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283. The plain error must have been of such a great magnitude that it probably changed the outcome of the trial. Id.

An accomplice is defined as one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. Lawson, 794 S.W.2d at 369. On the other hand, when the evidence is unclear, it becomes a question of fact for the jury to

determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. Id.; see Green, 915 S.W.2d at 831-32.

In this case, it is undisputed that Kejuan Shields was an accomplice in the murder of Anthony Jones. He was indicted for the offense along with Defendants Perry and Hampton and, during his testimony at trial, admitted his involvement in the crime. As such, the trial court properly instructed the jury that Shields was an accomplice as a matter of law and that his testimony must be corroborated.

However, Ladarrius Borrum's role in the murder is less certain. Shields testified that Borrum knew about the plan to execute the "SOS" on the victim and was acting as a "COP" or "Crip on patrol," whose function was "to watch out for the police or go back and make sure everything was taken care of." In contrast, Borrum testified that he thought they were "just going to beat [the victim] up and stuff like that" and did not know that an "SOS" had been put out on the victim. Even though he admitted that he was a few streets away from Cameron Street when he heard gunshots, Borrum testified that he did not follow Shields' car while they were driving around and said he was not acting as a "Crip on patrol." There was no testimony from any other witness concerning Borrum's involvement in the murder, and the testimony from Shields alone does not establish that Borrum could be indicted for murder. Therefore, the trial court properly instructed the jury that it was to determine whether the facts established that Borrum was an accomplice.

Since the trial court instructed the jury that it could find Borrum to be an accomplice and the record does not establish that he was an accomplice as a matter of law, Defendant Perry has failed to establish that the trial court breached a clear and unequivocal rule of law. In addition, Borrum's testimony was corroborated by other witnesses in regards to the car the defendants arrived in and type of weapon used. Thus, review of this issue is not necessary to do substantial justice.

## II. Defendant Hampton's Compulsory Process Issue

Defendant Hampton argues that the trial court denied his right to compulsory process by appointing counsel for a witness he subpoenaed and allowing the witness to assert his Fifth Amendment right not to testify.

Among the rights provided to an accused in a criminal trial under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution are the rights to confront the witnesses against him and have compulsory process for obtaining witnesses in his favor. See Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000).

"The calling of a witness who will refuse to testify does not fill the purpose of compulsory process, which is to produce testimony for the defendant." State v. Dicks, 615 S.W.2d 126, 129 (Tenn. 1981). In addition, our supreme court has stated that "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, . . . the right against self-incrimination is the stronger and paramount right." Id.; see also State v. Zirkle, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). The trial court has the duty to determine whether a witness has properly asserted his Fifth Amendment right against self-incrimination. Zirkle, 910 S.W.2d at 890. "Only a plain abuse of that authority constitutes grounds for reversal." Id.

The record indicates that both Defendant Hampton and the State issued a subpoena for Jonathan Foulks, but apparently only the defendant's subpoena was served on the witness. Several witnesses placed Foulks at the scene of the crime and implicated him as a shooter, but he was not indicted for murder. When Foulks appeared in court, it appears that the State, acting on its ethical obligations, asked the trial court to appoint counsel to advise Foulks of his right against self-incrimination. Later, at the State's request and with the approval of the defendants, the trial court allowed the State to call Foulks to the witness stand to assert his Fifth Amendment privilege in front of the jury. Under these circumstances, the trial court did not violate Defendant Hampton's right to compulsory process by allowing Foulks to assert his paramount right against self-incrimination. Defendant Hampton has, therefore, failed to show that the trial court abused its discretion. Defendant Hampton ignores the fact that he approved of the trial court's actions and fails to acknowledge that he never asserted an objection based on his right to compulsory process. Moreover, his argument suggests that he intended to discuss the case with Foulks and possibly call him as a witness without advising him to secure counsel, which is contrary to the Rules of Professional Conduct of the Rules of the Tennessee Supreme Court. See Tenn. Sup. Ct. R. 8, RPC 4.3.

### III. Defendant Hampton's Exclusion of Evidence Issue

Defendant Hampton argues that the trial court erred in not allowing him to cross-examine David Irvin about his hopes of getting a more lenient sentence on a pending carjacking charge to impeach his trial testimony. The State agrees that the trial court erred in refusing to allow the testimony but argues that the error was harmless.

In his cross-examination of Irvin, Defendant Hampton's counsel questioned Irvin regarding how his trial testimony differed from his statement to police. Defense counsel then asked Irvin if he was "changing [his] story because [he has] a carjacking case pending right now that [he] hope[s] to get some benefit from" his trial testimony. The State objected to the question, and the trial court sustained the objection ruling that the rules of evidence did not allow a pending charge to be used for impeachment purposes. However, the court agreed

that counsel could cross-examine Irvin in a jury-out hearing to determine if he was promised leniency in exchange for his testimony. The court said that, if the defendant established that Irvin was "hoping or expecting or has been promised something," then Irvin could be recalled to present the testimony to the jury. The court then instructed the jury to disregard the question and answer that Irvin gave in response.

Later, in the offer of proof, Irvin testified that he was indicted for carjacking on May 10, 2012, and that the case was still pending and he was represented by an attorney. Irvin stated that he and his attorney discussed the possibility of reaching a plea agreement with the State on the carjacking case, but he and his attorney had not discussed the defendants' case with each other or the State. Irvin said that he did not tell the prosecutor about his pending charge until the previous day when the prosecutor noticed that Irvin was wearing a tracking device on his ankle. The prosecutor did not promise him anything in exchange for his testimony against the defendants. Irvin stated that he "was testifying saying what I saw" and did not realize he could leverage his testimony to help reach an agreement in the carjacking case. He reiterated that he did not have any prior discussions with the prosecutor about his carjacking case. After this proof, the trial court ruled again that Defendant Hampton could not cross-examine Irvin about his pending carjacking charge.

In State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001), our supreme court explained:

> A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. See State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); see also State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). An undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. See Smith, 893 S.W.2d at 924; see also State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991).

A potential for bias exists when "a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial [because] . . . there is certainly the possibility that the prosecutor's office is going to take favorable testimony into account when subsequently prosecuting the witness's pending charge." State v. Eric James Taylor, Alias, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. July 9, 2003), perm. app. denied (Tenn. Oct. 6, 2003).

The propriety, scope, manner, and control of the cross-examination of witnesses rest

within the discretion of the trial court. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). This court will not, therefore, disturb a trial court's limits on cross-examination unless we find that the court has placed unreasonable restrictions on that right. State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001); Dishman, 915 S.W.2d at 463. Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. Sayles, 49 S.W.3d at 279. To show a violation of the right to confrontation, the defendant must show that "'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses.'" State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986)). Once a constitutional error has been established, the burden is on the State to prove that the error is harmless beyond a reasonable doubt. Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999).

As noted above, the State agrees with Defendant Hampton's claim that the trial court erred in limiting his cross-examination of Irvin to explore his potential for bias. The State asserts, however, that the error was harmless beyond a reasonable doubt, and we agree. As illustrated in the offer of proof, had Defendant Hampton been allowed to question Irvin about his pending carjacking charge, his testimony would have shown no bias. Irvin testified that he never discussed the defendants' case with his attorney in the carjacking case, and the prosecutor did not know about Irvin's pending charge until after the trial began. Irvin stated that he and the prosecutor did not discuss the carjacking charge and that no deal was offered in exchange for his testimony. Therefore, Irvin's pending charge revealed no potential bias, and the error in excluding questioning concerning it was harmless.

## IV. Both Defendants' Sufficiency Issue

Both defendants argue that the evidence is insufficient to sustain their convictions. They claim that the accomplice testimony was inconsistent and uncorroborated.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.");

State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (citing State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). This principle has

been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S .W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime,

including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. Additional factors from which a jury may infer premeditation include the defendant's failure to render aid to the victim, see State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000), and evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Kejuan Shields' testimony at trial established that the defendants and Jonathan Foulks were passengers in his black car when he drove to the victim's house so they could "take care of [the victim] and break him off." Shields said that a high-ranking member of the Grape Street Crips gang had issued an "SOS," or "shoot on sight or serve on sight," on the victim. Shields recalled that Defendant Perry was in the front passenger seat, Defendant Hampton was in the right rear passenger seat, and Foulks was in the left rear passenger seat, and that both defendants had nine-millimeter guns and Foulks had a .32 caliber gun. They were all wearing dark clothes. Shields heard Defendant Hampton call the victim and arrange to "get[] some weed," although the actual plan was to shoot the victim. Defendant Hampton called the victim eight to ten times to get directions to the house. Shields testified that, when they arrived on Cameron Street, the victim walked toward the passenger side of Shields' car to deliver the drugs, and the defendants opened fire on him. Shields said that Foulks also fired at the victim. Shields heard about twenty shots fired.

Several points of Shields' testimony were corroborated by other proof. Anthony Jordan and David Irvin, who were in the house with the victim, testified that they heard the victim receive a series of phone calls from someone wanting to buy marijuana from the victim and get directions to the house. They saw the victim walk outside and, soon after, heard ten to fifteen gunshots. When they went outside to see what was happening, Jordan saw a young man wearing dark-colored clothing jump in the backseat on the driver's side of a car parked in front of their next-door neighbor's house; there were three or four people in the car. Irvin saw a car in front of the house next-door; two men were getting into the car and a third man was "running and shooting at the ground." Irvin saw one man get in the front passenger seat, one get in the right rear passenger seat, and one get in the left rear passenger seat. All of the men were wearing dark clothes.

The physical evidence also corroborated Shields' testimony. Crime scene investigators recovered seventeen spent shell casings from the scene. Analysis at the TBI crime lab identified six of the shells as Remington nine-millimeter cartridge casings that had

been fired from the same unknown nine-millimeter firearm; four of the shells were Federal nine-millimeter cartridge casings that had been fired from another unknown nine-millimeter firearm; and seven shells were Winchester twenty-two long/long rifle cartridge casings that had been fired from the same unknown firearm. The medical examiner determined that the victim had died from multiple gunshot wounds.

Another gang member, Ladarrius Borrum, testified that he saw the defendants, Shields, and Foulks leave in Shields' car to go looking for the victim. He testified that Defendant Perry or Defendant Hampton, or both, usually carried a nine-millimeter weapon. Borrum stated that he heard gunshots when he was two to three blocks from the victim's home on Cameron Street.

The defendants' arguments that Shields and Borrum were not credible witnesses is without merit, as assessing the credibility of the witnesses is the province of the jury and not for this court to second-guess on appeal.

Viewed in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find each defendant guilty of premeditated first degree murder. Shields' testimony established every element of the offense, and his testimony was corroborated by other proof.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE